ANGELA DIVERSEY, Admx. etc.

*v.*

ANNIE V. JOHNSON, Admx.

| 93 | 547 |
|----|-----|
| 127 | 580 |
| 93 | 547 |
| 140 | 198 |
| 141 | 429 |
| 93 | 547 |
| 56a | 58 |
| 93 | 547 |
| 59a | 669 |
| 93 | 547 |
| 170 | 178 |
| 93 | 547 |
| 188 | 9294 |
| 93 | 547 |
| 192 | 9155 |

1. FORMER ADJUDICATION *of Supreme Court.* Where this court has held that a complainant in chancery is not guilty of such *laches* in filing his bill as to deprive him of a standing in a court of equity, this must be held as *res adjudicata* so far as that case is concerned, when it comes to this court again.

2. ADMINISTRATION—*personal estate primarily liable for debt.* The personal estate of an intestate is primarily liable for the payment of his debts, and no resort can be had to his real estate until the personal estate is exhausted or shown to be insufficient.

3. SAME — *discharge of administrator before all debts are paid is void as to unpaid creditors.* Where an administratrix is made a party to a bill originally filed against her intestate, by process soon after his death, and she proceeds to make final settlement of the estate, and obtains a discharge before the bill is heard, and distributes the personal estate, the order discharging her is a nullity so far as regards the rights of complainant in the bill, and on decree found she may be required to pay the amount thereof with costs of suit. Such a settlement and discharge is fraudulent in law.

4. SAME—*decree against administrator.* Where an administratrix has settled all the debts of an estate except one, the subject of prolonged litigation, and there still remains in her hands ample personal property derived from the estate of her intestate after final settlement of the estate and her discharge in fraud of the creditor whose debt was not yet established, and she resisted any decree in his favor, claiming the personal property in her own right, as acquired from the heirs for her release of dower in the real estate of the intestate, it is proper to order her to pay the amount of the decree in the due course of administration within a reasonable time, to be fixed in the decree.

5. PARTIES—*defendant in bill for account against representative of deceased partner.* On bill for an account against the administratrix of a deceased partner, the heirs at law of the deceased are proper, but not necessary parties. They are only liable for the debt of their ancestor, in respect of the lands by them inherited from him, in the event the personal property should be insufficient to discharge the just debts of the ancestor; and when the proof shows ample personal assets for that purpose, there is no error in dismissing the bill as to them. A decree against the administratrix is conclusive against the heirs as to the personal estate, but not as to the realty.

6. CHANCERY—*when evidence is not so clear in some points.* Where the evidence on a bill for a partnership account, on some points is not as full, definite and conclusive as the court might desire, yet where this is the result of the

548　　　DIVERSEY, ADMX. *v.* JOHNSON, ADMX. [Sept. T.

Statement of the case.

acts and delay of the defaulting partner whose duty it was to have made a settlement as surviving partner, and after his death there was caused still further delay by the destruction of all the records and books of account and other evidences, this court will not deny any relief on this ground, but will decide the best it can from the lights before it.

7. CONFUSION OF PROPERTY OR ACCOUNTS—*who must suffer loss.* If a party having charge of the property of another, so confounds it with his own that the line of distinction can not be traced, all the inconvenience of the confusion is thrown upon him who produces it, and it is for him to distinguish his own property or lose it. And this principle holds good in matters of account.

8. So, where a surviving partner, after the death of his partner still bought goods in the firm name of another firm of which he was a partner, and had or allowed the same to be charged to the old firm, the same as before the death of his partner, thereby so confounding that which was a liability of the firm, with his as surviving partner, as to render it impossible to separate the two, it was *held,* that the consequences of the confusion must fall upon him, unless he could show the parts chargeable to each.

9. PRACTICE—*cross-errors in Supreme Court.* Where the appellee fails to file cross-errors in the Appellate Court as to the ruling of the court below, he will not be allowed to do so in this court on an appeal from the Appellate Court.

APPEAL from the Appellate Court of the First District; the Hon. THEODORE D. MURPHY, presiding Justice, and Hon. GEO. W. PLEASANTS and Hon. JOSEPH M. BAILEY, Justices.

In the spring of 1860, Francis Johnson and Michael Diversey entered into co-partnership in the wholesale liquor business in Chicago. Johnson was already engaged in the business, having a stock on hand. Articles of co-partnership were drawn up and executed by the parties. It appears, therefrom, the partnership was to continue from April 3, 1860, until May 1, 1861, with the privilege of three years; that the stock and fixtures then on hand were estimated at $10,000, Diversey buying a half interest therein for which he paid $5000; that his interest in the house was to be represented by O. J. Rose as his true and lawful attorney; that the stock was to be replenished not exceeding $5000 or $6000, and when the bills matured, if the concern was not able to pay, Diversey was to furnish the means by indorsement or otherwise, the discount,

interest and principal to be paid by the firm; and in case of
the death of either party the business was to be continued
three months by the surviving partner.

It was at one time, pending the present litigation, before the
discovery of a copy of the partnership articles, erroneously
supposed the survivor had two years in which to close up the
affairs of the firm.

Johnson died on the 21st day of August, 1860, and Diver-
sey retained possession of the stock and assets as surviving
partner.

Some months after the death of Johnson, Diversey made a
transfer of the business to Edward Foster, in whose name it
was for a while conducted. The date of this transfer is not
ascertained. Mr. Foster, however, had no real interest in the
business, and the use of his name was entirely colorable. Fos-
ter afterwards transferred the stock back to Diversey, and in
November, 1861, Diversey sold it out to Turney, his own
clerk, and one Myers.

In the meantime, Annie V. Johnson was appointed admin-
istratrix of her husband's estate, and in December, 1861, filed
a bill in the Superior Court for a settlement of the co-part-
nership affairs.

Diversey died in 1869, and Angela Diversey, his widow,
was appointed administratrix of his estate, and was made a
party to the bill pending, and brought into court by service
of process, and made answer thereto. This suit was still
pending at the time of the great fire in 1871, when the record
and the papers therein were destroyed. The causes of the
delay in disposing of that suit were before this court in *John-
son, Admx.* v. *Diversey et al.* 82 Ill. 446. The files therein
were never restored, but several orders were entered in the
cause looking to such restoration.

On the 23d of March, 1873, Mrs. Diversey made a final
report to the county court, as administratrix of her husband's
estate, which was approved, and the estate was declared settled,

550        Diversey, Admx. v. Johnson, Admx.   [Sept. T.

Statement of the case.

and she was discharged from her office as administratrix by the formal order of the court.

On the 15th day of April, 1875, Annie V. Johnson, appellee herein, dismissed her original suit and immediately filed a new bill against Angela Diversey, as administratrix, and the four daughters and heirs at law of Michael Diversey, to-wit: Mary V. Bichl, Catherine Weckler, Elizabeth Kirchoff and Barbara D. Rose. To this bill Mrs. Diversey, Mrs. Weckler, Mrs. Bichl and Mrs. Kirchoff filed answers. No service was had in any manner upon Barbara D. Rose. The cause was heard in May, 1876, in the Superior Court, and the bill dismissed for *laches*. An appeal was taken to this court, and the dismissal was reversed and the cause remanded. *Johnson, Admx.* v. *Diversey et al. supra.*

Upon the return of the case from the Supreme Court it was referred to a master in chancery to take and state an account. Thereupon the proofs were taken.

The master made his report June 14th, 1877, and exceptions were filed thereto. On the 20th day of June, 1877, the appearance of the defendant Barbara D. Rose was entered, and on the 31st day of the following July she filed an answer to the bill.

On the 11th day of September, 1877, appellee dismissed her bill as to all the defendants except Angela Diversey, and on the 28th day of the same month she amended her bill.

The amendment converted the suit into one against Mrs. Diversey alone, as administratrix of the estate of Mr. Diversey, and asked to have the settlement and distribution of the estate declared fraudulent and void as against complainant. The grounds upon which the settlement and discharge were sought to be impeached were that the same were procured by fraudulent means, without notice to complainant, during the pendency of her original suit, and after her claim had been duly exhibited within two years from the granting of letters of administration on the Diversey estate. The allegation of fraud was as follows:

" That said settlement and discharge were made and procured through the false and fraudulent statements and representations of the said Angela Diversey, made under oath, that all the debts and liabilities of the estate of the said Michael Diversey, deceased, had been fully paid and settled before the said 24th day of March, A. D. 1873; and that she did not then know of any other claims existing against said estate, when in fact said claim of the complainant, as administratrix, etc., and which had been previously exhibited and presented to defendant, etc., had not been then paid," etc.

On the 8th day of October, 1877, the defendant, Angela Diversey, filed her further answer to the amended bill, alleging in substance:

1.   Her appointment February 23d, 1870, and her duty to proceed with reasonable dispatch.

2.   That she had been advised by Diversey, in his lifetime, that complainant's claim was unfounded; also by Rose,— which she believed to be the truth.

3.   That she was unacquainted with complainant; knew nothing of her proofs or witnesses.

4.   That after the destruction of the records she supposed and believed it impossible ever to ascertain the condition of accounts between Johnson and Diversey.

5.   Avers that final settlement was made in good faith; and that defendant as a matter of fact supposed that complainant's claim had been utterly abandoned, and that she was led to this belief by repeated failures of complainant to restore her original bill in accordance with the leave of court.

6.   Denies that she has in her hands any money or property which she holds as administratrix, or upon which complainant is entitled to a lien.

7.   Denies that she received any real estate.

 " 8.   Sets forth proceeding to partition real estate of Diversey—agreement on her part with heirs to receive $50,000 in capital stock of Lill's Brewing Company at its par value in lieu of her dower—decree cutting off same—and alleges that

"the only money or proceeds from estate of Diversey ever received by defendant has been derived from said brewery stock, and in lieu and satisfaction of the dower interest of defendant in the real estate of Mr. Diversey."

On the 9th day of October, 1877, the cause was brought to a final hearing, and a decree was entered in favor of complainant for $7612.

An appeal was prosecuted to the Appellate Court of the First District, and the decree of the Superior Court was there affirmed; and thereupon this appeal is brought here, and various errors and cross-errors are assigned.

Mr. H. BARBER, Jr., for the appellant:

1. Courts of equity do not make decrees on mere suspicion or conjecture. *The People* v. *Lott*, 36 Ill. 461.

2. The appellant supposed the claim in this case was abandoned when she made final settlement of the estate, and therefore it could not be fraud. Fraud can not exist without an intention to deceive. *Miller* v. *Howell*, 1 Scam. 499. A corrupt design will not be imputed where the party's conduct is consistent with an honest purpose. *McConnell* v. *Wilcox*, 1 Scam. 344.

3. At the most the settlement and distribution were only a *devastavit* on the part of the administratrix. 3 Williams' Exec., Am. ed. 1897. The remedy for a devastavit is twofold: 1. To proceed at law against an administratrix and her sureties. *Stow* v. *The People*, 25 Ill. 601; *Short et al.* v. *Johnson*, 25 id. 407; *Curry et al.* v. *The People*, 54 id. 264; *Rowan* v. *Kirkpatrick*, 14 id. 8; and 2. To proceed in equity against the distributees. *Ryan* v. *Jones*, 15 Ill. 1; *Van Meter's Heirs* v. *Love's Heirs*, 33 id. 260; *Cutright* v. *Sanford*, 81 id. 240; *Lewis* v. *Lyons*, 13 id. 117; *David* v. *Frowd*, 1 My. & K. 200; *Gillespie* v. *Alexander*, 3 Rup. 131; *Burnly* v. *Lambert*, 1 Wash. 308; *Waddy* v. *Sturman et al.* Jeff. Rep. 5; Lomax on Ex. 301, 302, 747; 1 Story's Eq. §§ 532, 533, 579.

4. The amended bill does not seek either of these remedies. The order of the county court declaring the estate settled and discharging the appellant from her office as administratrix, is an absolute bar to the relief sought. *Crossman* v. *Crary,* 37 Iowa, 687; *Modawell* v. *Holmes,* 40 Ala. 391; *Watts, Admr.* v. *Watts et al.* 37 id. 547; *Buckingham* v. *Owen,* 6 Smedes & Mar. 502; *Wiggin* v. *Plumer,* 31 N. Ham. 266; *Nat. Bank of Troy* v. *Stanton,* 116 Mass. 438; *Taylor* v. *Savage,* 1 How. (U. S.) 286; 1 Williams on Ex. 663–4; *Marsh* v. *People,* 15 Ill. 284; *Gold* v. *Bailey,* 44 id. 491; *Neubrecht* v. *Sautmeyer,* 50 id. 74.

5. In any aspect of the case there is a defect of parties. The dismissal of the bill as against the four daughters, the heirs-at-law of Mr. Diversey, was a fatal error. After the distribution of the estate they were *necessary* parties. *Burnly* v. *Lambert,* 1 Wash. 308.

Certainly, any attempt to set aside the final settlement in the county court rendered their presence absolutely indispensable. *Gilman* v. *Cairns,* Breese, 164; *Scott* v. *Moore,* 3 Scam. 306; *Martin* v. *Dryden,* 1 Gilm. 187; *Spear* v. *Campbell,* 4 Scam. 424; *Smith et al.* v. *Rotan et al.* 44 Ill. 506; *Prentice* v. *Kimball,* 19 id. 320; *Harrington* v. *Hubbard,* 1 Scam. 573; *The People* v. *Lott,* 27 Ill. 215; *Hartley* v. *Bloodgood,* 16 Ala. 233; *Chinn* v. *Caldwell,* 4 Bibb, 543; *Moon* v. *Munn,* 69 Ill. 591; *Alexander* v. *Hoffman,* 70 id. 114; *Atkins* v. *Billings,* 72 id. 597; *Hopkins* v. *Rose Clare L. Co.* 72 id. 373.

The settlement in county court was binding on Mrs. Diversey, as administratrix, and the heirs, until set aside. *Hanna* v. *Yocum,* 17 Ill. 387; *Short et al.* v. *Johnson,* 25 id. 406; *Propst* v. *Meadows,* 13 id. 169; *Stone* v. *Wood,* 16 id. 179; *Lynch* v. *Rotan,* 39 id. 15; *Bond* v. *Lockwood,* 33 id. 212; *Ralston* v. *Wood,* 15 id. 159; *Watts, Admr.* v. *Watts et al.* 37 Ala. 547; *Housh* v. *The People,* 66 Ill. 178; *Wheeler* v. *Dawson,* 63 id. 55.

6. The grounds alleged to impeach the settlement and discharge in the county court are wholly inadequate.

It does not appear why appellee did not resist the settlement and discharge in the county court, or seek the reversal of the order on appeal.

It does not appear when appellee first learned of the alleged fraud, and no explanation is offered of the long delay.

The settlement in the county court was made March 23d, 1873; the charge of fraud set up for the first time by amendment to bill on the 28th day of September, 1877. It came too late. *Davis* v. *Cotton*, 2 Jones Eq. Repts. 430–436; *Sawyer* v. *Birchmore*, 1 Keen's Ch. 403.

7. The funds alleged to be in the hands of appellant can not be treated as undistributed and unadministered assets. *Rowan* v. *Kirkpatrick et al.* 14 Ill. 8; *Stow et al* v. *The People*, 25 id. 602; *Short et al.* v. *Johnson*, 25 id. 496.

It was the proceeds of her dower interest in the real estate. The attempt to take it from her is in violation of a superior equity and the general right of retainer. *McCullom* v. *Chidester*, 63 Ill. 477; 2 Lomax on Ex. 770; 2 Williams on Ex. Am. ed. 1103; *Hosack* v. *Rogers*, 6 Paige, 415; 1 Story Eq. Jur. §§ 571, 574, 579, 579 *a*.

Mr. EPHRAIM BANNING, and Mr. HARRY HARRISON, for the appellee:

1. This case having already been before this court once, the principle of *res adjudicata* extends to all matters contained in the record presented in the other appeal; hence, such matters are no longer open for examination. *Semple* v. *Anderson*, 4 Gilm. 561–563; *Hollowbush* v. *McConnell*, 12 Ill. 204; *Rogers* v. *Higgins*, 57 id. 247; *Fuller* v. *Little*, 61 id. 26; *Cook* v. *Norton*, 61 id. 286; *Kingsbury* v. *Buckner*, 70 id. 517; *Clayes v. White*, 83 id. 540.

2. If it ever existed in fact, the Lill & Diversey ale account was barred by the Statute of Limitations before its settlement. Hence, no subsequent act of Diversey, or his representative, could revive it against Johnson's estate, or charge appellee with its payment. 1 Gross' Stat. ch. 66, § 18;

Story on Partnership, §§ 323–324 *b*; *Helm* v. *Cantrell*, 59 Ill. 524; *Bell* v. *Morrison*, 1 Peters, 366; *Hackley* v. *Patrick*, 3 Johns. 536; *Way* v. *Bassett*, 5 Hare's Ch. 54; *Brown* v. *Gordon*, 16 Beav. 302. ·

3. The order setting aside the settlement of Diversey's estate in the county court, is supported by the pleadings and evidence and is in conformity with the general rule of equity and well settled rule of practice. *Short* v. *Johnson*, 25 Ill. 489; *People* v. *Lott*, 36 id. 447; *McGhee* v. *Gold*, 68 id. 216.

4. It is immaterial whether appellant had a fraudulent intention or not in making the false reports through which her discharge was procured in the county court. *Lewis* v. *McLemon*, 10 Yerg. 206; *Foster* v. *Charles*, 6 Bing. 396; *Foster* v. *Charles*, 7 Bing. 105; *Pohill* v. *Walter*, 3 Barn. & Adol. 123; *Cabot* v. *Christie*, 42 Vt. 126; *Fisher* v. *Mellen*, 103 Mass. 506; Story's Eq. 193.

The settlement being made *ex parte,* while appellee's suit was pending, could not affect her claim. Toller's Exec. 494; 4 Burn's Eccl. Law, 605; 3 Redfield on Wills, 411–414, n. 71; *Saunders' Heirs* v. *Saunders' Exrs.* 2 Litt. 315; *Blakely* v. *Blakely*, 3 J. J. Marsh. 682; *Kellar's Exrs.* v. *Beelor*, 5 T. B. Monroe, 577; *Anderson* v. *Fox*, 2 Hen. & Mun. 264; *Clyce* v. *Anderson*, 49 Mo. 41; *Ogden* v. *Waller*, 24 Miss. 290.

5. Notwithstanding her settlement and discharge, the functions of Diversey's administratrix continued, and still exist as to all matters connected with appellee's claim. *Blanchard* v. *Williamson*, 70 Ill. 647; *Pollock* v. *Buie*, 43 Miss. 140; *Dogan* v. *Brown*, 44 id. 246; *Smith* v. *Hurd*, 7 How. (Miss.) 188; *Henderson* v. *Winchester*, 31 Miss. 295; *Gray* v. *Keill*, 22 id. 186; *Nooman* v. *Nooman*, 3 Ala. 389; *Skinner* v. *Frierson*, 8 id. 917; *Elwood* v. *Deifendorf*, 5 Barb. 398; *Wurts* v. *Jenkins*, 11 id. 546.

6. The personal representative is the only necessary party in proceeding relating to the personalty. 1 Daniell Ch. 254; Story's Eq. Pl. 140, 170, 187; *Stone* v. *Wood*, 16 Ill. 177; *Butts* v. *Genung*, 5 Paige, 259; *Jackson* v. *Forest*, 2 Barb.

Chy. 576; *Fripp* v. *Talbird,* 1 Hill Ch. (S. C.) 145.   The heirs will have a day in court, if the realty is sought to be taken. *Dorman* v. *Lane,* 1 Gilm. 143; *Stone* v. *Wood,* 16 Ill. 177.

7.   All money received and retained by appellant from her husband's estate is · held subject to appellee's claim.   *Sutherland* v. · *Harrison,* 86 Ill. 363; *Kuatchbull* v. *Fearnhead,* 3 Myl. & Craig, 122; *Johnson* v. *Fuquay,* 1 Dana, 514; *White* v. *Swain,* 3 Pick. 365; *Kippen* v. *Carr,* 4 Munf. 119; *Crane* v. *Brainard,* 2 Root, 118.

Mr. JUSTICE BAKER delivered the opinion of the Court: .

It is urged the fundamental error herein, upon the part of the Superior Court, was in attempting to make a decree in the condition of affairs disclosed by the proofs.   It is true, the lapse of time, the death of the parties and of many of the witnesses, the destruction of the files, records and testimony in the original suit, and of the books and papers of the firms of Johnson & Diversey, and Lill & Diversey, have rendered it difficult, if not impossible, to ascertain with precision the exact state of accounts between the former partners.   The point is made, in such cases courts of equity decline to interfere, and 1 Story's Eq. Jur. § 529, and other authorities, are cited in that behalf.   The exception to the rule relied on is found in the latter part of the section referred to; it is, that "under peculiar circumstances, excusing or justifying the delay, courts of equity will not refuse their aid in furtherance of the rights of the party, since, in such cases, there is no pretence to insist upon *laches* or negligence as a ground for dismissal of the suit."   The cases cited by appellant are all cases where relief was refused on account of *laches* imputed to complainant.

But this is all *res adjudicata,* so far as regards this controversy.   When the case was here before (*Johnson, Admx.* v.· *Diversey et al.* 82 Ill. 446) we said: "All the facts and circumstances considered, it does not appear complainant has been guilty of such *laches* as would deprive her of any stand-

ing in a court of equity." And also said: "The difficulties in the way of taking an accurate account, in consequence of the death of the parties and of some important witnesses, we apprehend will be quite as embarrassing to complainant as to defendants. But were it otherwise, that fact constitutes no insuperable objection to adjusting accounts of trust funds that ought to have been done sooner. It is, perhaps, the misfortune of defendants arising out of the neglect of their ancestor to render an account of funds with which he is charged as having in his possession."

It is also urged, the remedies for a *devastavit* are twofold: to proceed against the administratrix and her sureties, or to proceed against the distributees; and it is contended the amended bill does not seek either of these remedies, and that the order of the county court declaring the estate of Diversey settled, and discharging appellant from her office as administratrix, is an absolute bar to the relief sought.

The proofs show all the claims against the intestate, except that here in controversy, have been paid; that among the personal assets which came to appellant's hands as administratrix of her husband, were 1780 shares of the capital stock of Lill's Chicago Brewery Company, and that 1160 of said shares still remain in her possession, and are of amply sufficient value to pay and satisfy the decree herein.

The personal estate of the deceased was primarily liable for the payment of his debts, and no resort can be had to his real estate until the personal estate is exhausted or shown to be insufficient. Rev. Stat. 1874, ch. 59, § 12 and § 14; *Ryan* v. *Jones*, 15 Ill. 1; *McLean* v. *McBean*, 74 id. 134; *Sutherland* v. *Harrison*, 86 id. 363.

Here, the heirs at law of deceased were proper but not necessary parties; it was vain and useless to retain them as defendants to this suit with the idea of making the debt out of realty before exhausting the personalty; they were only liable for the debt of their ancestor in respect of the lands by them inherited from him in the event the personal estate

should be insufficient to discharge the just debts against such ancestor. When, therefore, the proofs developed the fact such contingency would probably not arise, they were, not improperly, dismissed out of the suit, and it thereafter prosecuted against the personal representative alone. The administratrix is the sole representative of the personal estate, and a judgment against her is conclusively binding against such estate, and the heirs or persons entitled to the residue of personal assets after payment of debts were not necessary parties. Story's Eq. Pl. § 140 and § 170. If these heirs had been retained as parties, then they would have been bound by the decree rendered, but as the suit was dismissed as to them, should it become necessary to seek to charge them with the debt of their father by suit under the provisions of the Statute of Frauds and Perjuries, or by a proper proceeding to sell the lands inherited by them, then they will have a right to contest the validity of the claim of appellee. *Stone* v. *Wood,* 16 Ill. 177.

The alleged final settlement and discharge of the administratrix did not prevent the subsequent prosecution of the claim against her, or its allowance as a charge against the estate of deceased. In 2 Redfield on Wills, 411, it is said: " It is not competent for the court of probate to decree the account of the personal representative passed upon by it, to be final, so as effectually to discharge him from any future liability to be called upon to answer for matters not embraced in the former account." Here, this claim of appellee was not embraced in the final or any former account.

In *Blanchard* v. *Williamson,* 70 Ill. 647, it was held the county court had no legal authority to discharge an administrator before the estate was completely settled, and if it did the order could not operate to affect the rights of creditors and would not prevent a creditor from presenting a claim and having it allowed, and that this might be done at any time before the claim was barred by the general limitation law,

although such allowance might be good only as against assets not inventoried or accounted for.

In *Cutright* v. *Stanford*, 81 Ill. 240, the claim was presented and allowed in the probate court after two years from the grant of administration, and after the administrator had distributed the residue in his hands to the heirs, and his final report had been approved by the court and he finally discharged from all duties and liabilities on account of his said administration, and yet the claim was held to be a valid one against the estate.

In *Sutherland* v. *Harrison, supra,* the final account of the administrators was approved, all the debts proven having been paid, and an order of distribution and discharging the administrators was made, and it was claimed the settlement of the estate and discharge of the administrators by the probate court should be held as conclusive of the right of the widow to all the personal estate, and we there said : "The settlement of the estate involved nothing in respect to the validity of this debt in question." And in that case the surplus personal estate in the hands of the widow was held liable for the payment of the debt.

This is not the case of a claim not exhibited within two years from the granting of letters, for here suit was pending against intestate for an account at the time of his death, and appellant was, within a short time thereafter, made party defendant thereto and served with summons, and appeared and answered the bill. Appellee, therefore, is not confined to after-discovered assets for satisfaction of her debt. While suit was pending and undisposed of, appellant assumed to make final settlement of the estate. This she could not do. Such settlement was a nullity so far as regards appellee's rights. The personal estate held by this administratrix was the fund for the payment of such decree as might be rendered herein, and what remained after the payment of this and all other debts duly exhibited was subject to distribution. Before such satisfaction of debts it was not competent for the administratrix and widow to make any arrangement with the heirs

whereby these 1160 shares of stock she held as personal representative of deceased, and primarily in trust for the payment of his debts, could be so vested in her in her own right as to deprive this creditor of the legal right to hold such property, while remaining in her hands, responsible for this claim. Possibly, if a cross-bill had been filed and the heirs again brought into the controversy, there might have been, under the circumstances of the case, a marshalling of assets, so as to protect the equities of appellant, if any such she has.

It is said in 1 Story's Equity Jurisprudence, § 187, "fraud, indeed, in the sense of a court of equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." Within this definition the acts of the administratrix were a fraud upon the rights of appellee. By a breach of a legal duty devolved upon and trust reposed in her, she deprived appellee, a creditor, of the benefit of a trust fund provided by the law for the satisfaction of her demand. She accomplished this by a false statement of fact, made under oath. Equity will regard the arrangement made with the heirs, and settlement based thereon, at least so far as concerns the personal estate still remaining in the possession of the administratrix, as inoperative and void as against the claim of appellee, and this, notwithstanding the fact that appellant may have had no fraudulent intention when she falsely reported, under oath, to the probate court that she "then knew of no other existing demands against said estate," and thereby procured the settlement and order of discharge. It is wholly immaterial whether she, thus making false statements as to a material fact, knew them to be false or not, for she assumed to know when she made the affirmation. 1 Story's Eq. Jur. § 193; Tiffany & Bullard on Trusts and Trustees, 172.

Appellant had been notified of the Johnson claim, for, as the representative of the estate, she had been summoned to answer the bill filed for an account, and had answered in the

suit, and, although the record and papers in that suit had been destroyed by fire, and had not been replaced, yet she was bound to know that in contemplation of law such suit was still pending.

As the record abundantly shows appellant had settled all other debts, and still retained in her possession ample personal property, derived from the estate of her intestate, with which to satisfy the decree, there was no error in making the order requiring her to pay the amount into court. As we have seen, such property still continued to be assets in her hands for the payment of this debt. It is not perceived how, when all other demands have been settled and the estate remains open only as regards the one claim, and the administratrix has assets wherewith to pay the decree rendered for that claim, and she stands before the court in the attitude of claiming such assets in her own right and as relieved from their fiduciary character, it can be otherwise than proper to order the defendant should pay such claim in due course of administration, and that she should pay the same within a reasonable day fixed by the decree. Were there any question of a sufficiency of assets, or if it did not fully appear the estate, otherwise, had been settled as regards claims against it, or were the attitude of the administratrix other than it here is, the personal decree requiring payment by appellant might have been improper.

It is claimed there was such acquiescence of appellee in the settlement made by the county court as will prevent her now claiming such settlement was fraudulent or void. We do not so understand the record. The bill filed in 1875 states the fact of such settlement and distribution, and that the widow and each of the children received real estate and other assets from said estate to the amount of $50,000 and upwards; but it charges they "received and held, and still hold, said property in trust for complainant to the amount due her upon a final settlement of the partnership business." This, as we understand, shows no acquiescence in this settlement and dis-

562    DIVERSEY, ADMX. *v.* JOHNSON, ADMX.    [Sept. T.

Opinion of the Court.

tribution among the heirs and distributees of the property, but expressly claims and insists such distribution was subject to her rights and the property bound for her debt. How bound for her debt? How held in trust for her? Plainly, only so held and bound to the extent and in the order it was under the law of the land liable for the payment of her debt. Under that law the personal property was primarily liable, and the real estate liable only if there should be a deficiency of assets. So, whether complainant proceeded to decree under her bill as it was first filed against appellant and the heirs, or under her bill as amended against appellant alone, still it was a proceeding to procure a settlement of accounts and a decree for the amount due her; and, in either event and under either bill, that amount to be made out of the personalty, unless there was a deficiency therein. Under the bill as first filed the complainant and all the defendants were alike bound to know the decree recovered, if any, must first be satisfied out of the personal estate.

When this cause was remanded from this court, it was referred to a master to take and state an account between the parties. This was done, and an elaborate report was made to the Superior Court. The voluminous testimony taken in the case is preserved in the record. The amount the master found due complainant was $8895.20. Exceptions were filed to the report. Subsequently, on the final hearing of the cause, a decree was rendered by the court for $7612.00, and for costs.

Reference is made by appellant to *People* v. *Lott*, 36 Ill. 448, and the remark there made, we could not, in any case, make decrees on mere suspicion or conjecture, and it is urged, in substance, that in the case at bar the original transactions are so obscured by time and the evidence so lost and destroyed as to present insurmountable objections to any attempt to do justice between the parties. It will be noted, however, the court was considering the *Lott case* " with reference simply to the proof that should now be required." The gross *laches* of the complainants in so long neglecting to prosecute their

alleged claims, was referred to, and it was there said, "theirs has been the delay, and on them must fall the consequences." But, this case stands on other ground; when it was here before, we said "complications and difficulties arising out of the civil war, and the destruction of the records, were the causes of the chief delay. No delay arising out of either of those causes could be imputed to complainant as *laches.* It was in the power of the surviving partner, in his lifetime, to have put an end to this litigation by rendering an account of the trust funds that came to his hands. That effects belonging to the firm came to his possession as surviving partner, is not denied; but how they were disposed of, is not known. So far as this record discloses, he rendered no account. Had Diversey, in his lifetime, shown a tithe of the anxiety manifested by complainant to settle the partnership transactions, they could have been adjusted before his death."

In *Laswell* v. *Robbins,* 39 Ill. 210, it was said: "Plaintiff in error having received the partnership property, and being by the terms of the partnership entrusted with its custody, management and disposal, when shown that he received it, he must be charged with its value, and, to discharge himself, he must account for its disposition, and what he has done with the proceeds." It is admitted the evidence here, on some points, is not as full, definite and conclusive as we would like? But what are we to do? Are we for that reason alone, and because Diversey and appellant have failed to account for this trust fund, although urged thereto, until the transactions have become obscure, therefore to turn appellant out of court? We think, clearly not. We must do the best we can, in furtherance of justice, from the lights before us.

The report of the master and the decree of the court found the value of the stock and fixtures of Johnson & Diversey on hand August 21st, 1860, the date of Johnson's death, to be $8300. An account of the stock was at that time taken by Quigg, the bookkeeper of the firm, assisted by Terrass and Lampertz. Van Leer was also present when the stock

was taken. Mr. Lampertz is dead and his testimony is not preserved. Terrass says the value of the stock and fixtures was about $8300. Quigg says it was not quite $9000, but lacked very little of it. Van Leer says it was about $8000 or $9000. We think their testimony much more satisfactory than either the statements of Turney as to the inferior character of the stock on hand in November, 1861, fifteen months thereafter, when Myers and he bought out the stock, and when it had run down to about $2700; or the statements of Hand as to what customers reported to him as to the goods when he was attempting to make collections in November, 1860, and thereafter. Especially so when experts in such matters, as Terrass and Van Leer appear to be, testify so positively, from personal examination, as they do, to the good quality of the stock, and say it was as fine a stock as is usually kept by liquor merchants.

As to the cash on hand and accounts collected:—The amount fixed by the master and allowed by the court was $7000. Both Quigg and Terrass swear the cash on hand, bills receivable and accounts of the firm amounted to between $21,000 and $22,000; that at the time of taking stock about $4000 of these accounts were considered either doubtful or bad, and the remainder considered good. Turney, one of the witnesses for appellant, and who succeeded Quigg as bookkeeper in February or March, 1861, says there were about $18,000 of accounts then on hand. In view of the statements of Quigg as to collections made while he continued as bookkeeper, we think it a reasonable conclusion the reduction in the accounts, in the interval between Johnson's death and the advent of Turney, from between $21,000 and $22,000 to $18,000, was caused by collections made; and according to Turney's testimony some $4000 was collected on the $18,000 of accounts. We think the allowance by the master of $7000 for cash and accounts was justified by the evidence. More especially, in view of the fact Diversey, as surviving partner, had in his hands the data for rendering a correct ac-

count of cash and collections, and persistently refused and neglected so to do for some nine years, and until his own death and the subsequent destruction of all the books and papers of the firm by the fire of 1871 destroyed this data. This fact, when considered in connection with his other conduct in making a pretended sale of the entire stock after the death of Johnson to one Foster, and claiming, in the original suit prosecuted by the administratrix for an account, it was a *bona fide* sale, and in afterwards re-selling the stock to his own clerk, does not require of a court of equity it should cast upon the administratrix, who is here seeking an account of this trust property, the burden of proving with any very considerable degree of certainty just what Diversey did with the assets and accounts. Nor do we deem it unreasonable to conclude, as Diversey continued to carry on the business for more than a year, either through his son in law, Rose, or in the name of Foster, that as much as one-third of the outstanding accounts, even though they were liquor accounts, were collected and realized upon.

If the testimony of Quigg is to be relied on, then the master was justified in finding the indebtedness of the firm to be $9200, and that *that* amount included the ale account owing to Lill & Diversey. That the books of Johnson & Diversey so showed is corroborated by Terrass. One principal point of controversy is this ale account of Lill & Diversey. The matter stands thus: The firm of Johnson & Diversey did buy ale of Lill & Diversey. The books of Johnson & Diversey showed that account to be between $800 and $900, and their bookkeeper says the whole ale account was included in the amount of the indebtedness of the firm as shown by the inventory made when stock was taken. But appellant claims this ale account was some $10,000, instead of between $800 and $900. Hine, bookkeeper for the brewery, says they didn't have less than $10,000 worth, and he thinks it was considerably more,—from $10,000 to $12,000. Meckelke, collector and assistant bookkeeper for the brewery,

says they must have owed the brewery, at the time of Mr. Johnson's death, " almost over $9000." Sunderlich, the brewery teamster, testified, in general terms, to hauling large quantities of ale to the firm, and thought he delivered ale to Johnson & Diversey for about two years or over. Weckler says that in 1870 there was a settlement between Lill and the Diversey estate, and there was a large account, a large balance against Mr. Diversey on the books of Lill & Diversey, in the neighborhood of $24,000. It was for ale and *sundry matters of that kind,* as Mr. Lill informed him. Diversey was dead, and he only had to take Lill's statements. Witness testified he could not say what the amount of Johnson & Diversey's account was, included in the account of Lill.

Meckelke was recalled, and, among other things, testified as follows:

" *Question.* In your testimony before the master you gave an estimate of the amount of ale which the firm of Johnson & Diversey had from Lill & Diversey. Do you remember the amount as you estimated it before the master?

"*Answer.* If I remember right, it was about $9000 or $10,000.

" *Question.* Now, how did you arrive at that amount?

"*Answer.* From the statements made at the brewery, where I was engaged at that time.

" *Question.* Well, was it from the examination of the brewery books?

"*Answer.* It was from the examination of the brewery books, undoubtedly.

" *Question.* Now, do you remember how that account (of Johnson & Diversey) was kept on the books of Lill & Diversey?

"*Answer.* No, I do not.

" *Question.* Do you know how the account of Edward Foster was kept?

"*Answer.* I don't remember how it was kept.

"*Question.*    Mr. Quigg has undertaken to tell us how the book looked; that there was an account of Johnson & Diversey; that, after Johnson's death, that was ruled off, the balance brought down, and a new account commenced under it for Foster, leaving the title the same. What is your recollection about that?

"*Answer.*    I don't know anything about that."

Hine was recalled, and stated the account was kept in the same name until the transfer to Foster, when an account was entered in Foster's name.

We have carefully examined, not only as it is found in the abstract, but in the record itself, the testimony of Hine, Meckelke, Sunderlich, Weckler and Quigg, (who was afterwards, for about nine months, an assistant bookkeeper at the brewery,) in regard to this claim of $10,000 for ale, for the purpose of ascertaining, if possible, just what was shown by the books of Lill & Diversey, and whether the claim was or was not sufficiently established. The books are destroyed. The evidence abundantly shows ale was delivered to the house right along after Johnson's death, for more than a year, and, according to some of the testimony, in increased quantities. Weckler expressly says he could not state what the amount of the Johnson & Diversey account was, included in the account of Lill, settled by him after Diversey's death. Sunderlich testified on the theory the firm of Johnson & Diversey continued for two years or more, whereas it was in existence but a few months. The examination of Meckelke shows he has but little recollection, and probably at no time had much knowledge, as to what the books of Lill & Diversey did contain, or how they were kept. The evidence of Hine shows that at least until the fictitious sale to Foster, and that date is left uncertain by the record, the ale purchased while Rose was in charge of the store was still charged as though sold to the firm of Johnson & Diversey. There is no pretence for saying the ale thus charged in the interval between the death of Johnson and the transfer to Foster, enters into the

statement of account and settlement now made as an element of benefit or profit to appellee. Quigg testifies that even the ale sold to Foster was charged on the brewery books "right along and posted just the same as if it was Johnson & Diversey," and he details a conversation with Diversey that corroborates that view.

But let us assume the statement of Hine to present the real state of fact; then, how much of the $10,000 or $12,000 worth of ale was furnished prior to the decease of Johnson and the count of stock? And, how much thereafter and while the business was controlled by Diversey and Rose, and during which time the ale purchased clearly did not enter into or swell the partnership fund? If Diversey, after Johnson's death, purchased liquors, and retained or turned over to his son-in-law, Rose, the proceeds thereof, upon what principle of right or justice can the estate of his deceased partner be charged with the moneys paid by him or his legal representatives for such liquors? How, here, can we ascertain what proportion of this ale account was prior to the count of stock and went to swell the partnership assets? And what proportion was of the character we have above indicated? Where and how will we draw the line? It is apparent an unknown and unascertainable portion of the amount claimed was for ale for which, in equity and good conscience, appellee should in nowise be charged.

It is possible, perhaps probable, the books of Johnson & Diversey did not show all the ale obtained by them. But, how can we right that matter? Even if the amount charged the firm on the brewery books was definitely ascertained and the books shown to be, otherwise, correct, yet it is clear that amount would include not only the ale that would be a proper charge herein, but also other ale that never went to swell the partnership fund, but that, by the direction or acquiescence of appellant's intestate, was entered along with such proper charges, and the two so commingled that it is now impossible to say how much of this charge of $9000, or $10,000, or

$12,000, or whatever else it may be, should be here taken into account. If we admit one party must suffer a loss, which must it be? Should it be appellee, who as early as in 1860 sought to obtain from Diversey a settlement of these accounts? Or should it be the estate of him who, disregarding the trust in him reposed, refused to render an account, and who is responsible for this mixture of accounts?

If a party, having charge of the property of another, so confounds it with his own that the line of distinction can not be traced, all the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it; and this principle also holds in matters of account. *Hart* v. *Ten Eyck*, 2 Johnson's Chy. 108; *Attorney General* v. *Fullerton*, 2 Vesey & Beam's Chy. R. 264; *Lupton* v. *White*, 15 Vesey, Jr. 432; *White* v. *Lady Lincoln*, 8 id. 364; 1 Story Eq. Jur. 468. The rule is applied, both at law and in equity, to all cases of a confusion produced by a person who has charge of the property of another. *Brackenridge, Admr.* v. *Holland*, 2 Blackford, 377.

This principle has application here. Diversey, as surviving partner, had possession and control of the stock, business and concerns of the late firm, and the firm had an account for ale with the brewery, in which, also, he was a partner. After the death of Johnson, he continued to purchase ale from the brewery and had it charged to the same account. It was his duty, as surviving partner of one firm and member of the other, to see the account for this latter ale was distinguishable from that obtained by the firm. This he failed to do, and admittedly down to the transfer to Foster, and may be until the sale to Turney & Myers, the ale continued to be charged on the same account by his own bookkeeper, and presumably with his knowledge and by his own direction. The proceeds of this latter ale did not go into the assets of the late firm, and have never been accounted for by him to the administratrix of Johnson, and are not involved as a subject matter of relief in the decree herein. He has so confounded that which was a

liability of the firm with a personal liability of his own that it is impracticable to tell or even approximate what of this whole account is a debt chargeable to him alone, and what is a debt against the trust fund of which he had control. The consequences of the confusion must be thrown on him, as he occasioned it, and it is for him to show what proportion of the whole is chargeable to the partnership fund. This he has not done. His acts, his conduct and his *laches* have occasioned the dilemma. and on him and his estate must the loss, if any there be, fall.

Under all the circumstances of the case we are constrained to say it was not error in the Superior Court to refuse to allow the claim for ale to a greater amount than what was shown by the books of Johnson & Diversey.

A point is made as to an invoice of $1300 or $1350 worth of brandies from New Orleans. At the time of Johnson's death and of the count of stock, bills therefor had arrived but the goods had not. The omission of this purchase from the assets and liabilities is undisputed. It was considered by Quigg, Terrass and Lampertz that if it was put into the stock it would increase both liabilities and assets, and so it was left out.

These goods afterwards arrived, and it is claimed there was a loss of at least $1000 on them, and that there is no good reason why Diversey should bear this loss alone.

Several reasons may be suggested. It appears, from the evidence, they were not really purchased until afterwards. Quigg says, and he is not contradicted, these goods were "afterwards purchased of Nickerson & Co." They arrived after Johnson's death and were received by Rose, the son in law and agent of Diversey. It appears the firm had the privilege of returning them if they did not suit; "they could either return the goods or take them, as they chose when they came." Now, if this liquor was the miserable stuff claimed, it was plainly Diversey's duty to have ascertained that fact on their arrival and availed himself of the right to send them back.

He should have been especially cautious in respect thereto, for they were sent as foreign liquors and were comparatively dead stock for that reason, only one gallon of such liquors being saleable, as the evidence shows, to ten or fifteen gallons of domestic liquors; and he, as surviving partner, was in a position where it was his duty to close out the stock of the late firm as expeditiously as was safely practicable.

Again, it appears a copy of the inventory of stock, etc., was delivered to Diversey, or to Rose, his representative, and Diversey was chargeable with notice this invoice of brandies was omitted from the inventory as not being part of the partnership assets, and he does not appear ever to have made objection to such omission. And, if the venture had proven profitable, there is no pretence for saying, under the evidence in this record, the estate of Johnson would have shared in such profits.

The identity of this invoice of brandies with the $1300 worth of liquors from which the loss accrued is by no means clear. Turney's first acquaintance with the stock was in February, 1861, when he went there to keep the accounts of Diversey. This was six months after the death of Johnson. He speaks of "$1300 worth of Johnson & Diversey goods" which were afterwards sold to him for $333; he says " some of them were brandy packages but nothing but highwines, and some gin packages and nothing but domestic gin in imported packages." Quigg states he did not know what $1300 worth of goods Turney referred to "unless it was the invoice of brandy from New Orleans." *Non constat* the " brandy packages" and "gin packages" were the "invoice of brandy" from New Orleans. According to Quigg, a few of the packages of the New Orleans invoice were sold by Rose to Reed, a wholesale druggist, but there is no account rendered by either Diversey or appellant of such sale. Turney says, frequently in those days as soon as an imported cask was empty it was filled with domestic goods. It is not improbable these packages spoken of by him were packages so emptied and re-filled during the time intervening between Johnson's death and his advent

in the house. The proofs show a mixer of liquors was constantly in the employ of the establishment. Indeed, this whole matter of this loss is a mere surmise. We find in the record no testimony that identifies the liquor spoken of by Turney as a part of the Johnson & Diversey stock. Turney evidently did not know that fact.

As it stands, we are unable to say it was error in the court to refuse to allow the estate of Diversey a credit for loss sustained by him on the New Orleans purchase of brandy.

Cross-errors are here assigned by appellee. It sufficiently disposes of them to say they are assigned for errors supposed to have been committed by the Superior Court of Cook county in entering the decree herein, and that if relied on they should have been assigned upon the record in the Appellate Court. Not having been so assigned we can take no notice of them.

Finding no substantial error in the record, we are of opinion the judgment of the Appellate Court should be affirmed, and it is so ordered.

*Judgment affirmed.*